JUDGE DANIELS

13 CIV 7950

PREET BHARARA
United States Attorney for the
Southern District of New York
By: SHARON COHEN LEVIN
    ANAND SITHIAN
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/1085

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :
                                  :
         -v.-                     :    13 Civ.
                                  :
ANY AND ALL FUNDS ON DEPOSIT IN   :    ECF Case
JPMORGAN CHASE & CO. ACCOUNT NUMBER :
000000999753338 HELD IN THE NAME OF :
ELEGANT FOOTWEAR, INC., UP TO AND :
INCLUDING THREE HUNDRED           :
SEVENTY-SEVEN THOUSAND THREE      :
HUNDRED TWENTY-SEVEN DOLLARS AND  :
SEVENTY CENTS ($377,327.70), AND  :
ALL PROCEEDS TRACEABLE THERETO,   :
                                  :
              Defendant *in rem*. :
                                  :
- - - - - - - - - - - - - - - - - x

VERIFIED COMPLAINT



        Plaintiff the United States of America (the "Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its verified complaint, alleges, upon information and belief, as follows:

                I.   **NATURE OF THE ACTION**

        1.   This is an action by the United States of America

1

seeking forfeiture of the property described below:

> Any and all funds on deposit in JPMorgan Chase & Co. Account Number 000000999753338 held in the name of Elegant Footwear, Inc., up to and including three hundred seventy-thousand three hundred twenty-seven dollars and seventy cents ($377,327.70), and all proceeds traceable thereto (the "Defendant Property")

2. The Defendant Property is subject to forfeiture pursuant to 31 U.S.C. § 5317(c) as property involved in a transaction structured to evade reporting requirements, in violation of 31 U.S.C. §§ 5313, 5324 and 5331, or any conspiracy to commit such violation, or any property traceable to any such violation or conspiracy. In addition, the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions and attempted money laundering transactions, in violation of 18 U.S.C. § 1956, and as property traceable to such property.

## II.   JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York, and also pursuant to 28 U.S.C. § 1395 because the Defendant Property is located in the Southern District of New York.

### III. <u>PROBABLE CAUSE FOR FORFEITURE</u>

5. An investigation regarding the laundering of narcotics proceeds conducted by agents of the United States Drug Enforcement Administration (the "DEA") and other law enforcement agencies has revealed the following:

### <u>Background</u>

6. Narcotics traffickers accumulate large cash proceeds from the sale of narcotics in the United States. The traffickers, or those associated with the traffickers, frequently attempt to make those proceeds appear legitimate (<u>i.e.</u>, to "launder" them) by making the proceeds appear to have been generated by a legitimate source. The traffickers must also devise various methods to remit those narcotics proceeds to the suppliers of narcotics located in Colombia, Mexico, and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

7. In order to accomplish these goals, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in an attempt to make their narcotics proceeds appear to be from legitimate sources and to move those proceeds through the financial system into the countries where narcotics are manufactured.

8. One popular method used to launder narcotics proceeds

3

is commonly known as the Black Market Peso Exchange ("BMPE"), which is also known as trade-based money laundering. In the BMPE, narcotics traffickers, through a third party, "sell" their narcotics proceeds in the United States in exchange for pesos in countries such as Mexico and Colombia. This third party, called a BMPE money broker ("money broker" or "peso broker"), can bring the drug dollars and the legitimate pesos together.

9. In a common BMPE scheme, a money broker will identify a South American or Mexican businessperson, who imports goods from places such as the United States, China, or Panama. The money broker will offer that businessperson an opportunity to pay his/her debt owed to an exporter in a foreign country in U.S. dollars at a significant discount compared to the cost of making the payment in U.S. dollars through a South American or Mexican bank. The businessperson who agrees to this scheme will then turn over the payment for the imported goods in the form of pesos to the money broker who in turn will contact a Drug Trafficking Organization ("DTO"). When the money broker contacts the DTO, the broker will offer the pesos in South America or Mexico in exchange for narcotics proceeds in U.S. Dollars which are located in the United States. By operating on the "black market", the South American businessperson, money broker, and DTO avoid governmental and law enforcement scrutiny that typically comes with regulated transactions through financial

institutions.

10. The money broker will arrange to have the narcotics proceeds in cash picked up from the DTO by a member of the money broker's organization. These money pick-ups will usually occur between two people who have never met before and will most likely never meet again. These money pick-ups frequently involve several hundred thousands of U.S. dollars in narcotics proceeds.

11. Following the money pick-up, the money broker arranges to forward those drug proceeds to an exporter of goods in the United States. This is frequently accomplished by directly depositing the narcotics proceeds into accounts held by the exporter or by depositing the narcotics proceeds into an account unrelated to the foreign businessperson's business and then wiring the deposited proceeds to the exporter's bank account. Frequently, these deposits and wire transfers are made in different geographical locations from where the exporter is located, rather than transporting all of illicit dollars to the location where the exporter is located.

12. The process of using one or more couriers to make deposits of cash into third-party bank accounts is known as "smurfing." The couriers, or "smurfs," take illegal drug proceeds from the money broker and, at the money broker's direction, deposit the drug proceeds into the account of a third-party, usually the

exporter. These deposits are usually in low-value amounts to avoid detection and scrutiny by government authorities.

13. Once the narcotics proceeds are deposited in or wired to bank accounts held by the exporter, they can then be used to satisfy debts owed to the exporter from the foreign businessperson or can then be forwarded to other entities in further attempt to launder the funds by placing additional financial transactions between the sale of narcotics and the ultimate destination of the funds.

14. By engaging in transactions such as those described above, all three parties involved in the BMPE process benefit: the South American businessperson has successfully purchased imported goods in U.S. dollars using drug proceeds located in the United States without paying the fees or taxes associated with official bank transactions; the DTO has successfully converted their U.S. dollar drug proceeds in the United States into pesos in Mexico or another South American country, which they can then freely spend; and the peso broker earns a commission or fee based on the amount of U.S. dollars and pesos laundered through the BMPE system.

## STRUCTURING AND THE BANK SECRECY ACT

15. The Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 et. seq., also known as the Bank Secrecy Act (the "BSA"), was designed to combat money laundering and other crimes by, in part, imposing reporting requirements on virtually all

6

transactions involving more than $10,000 in United States Currency.

16.  Title 31, United States Code, Section 5313(a) and its related regulations, including 31 C.F.R. § 1010.311, provide that when a domestic financial institution, including banks and money service businesses, is involved in a transaction for the payment, receipt, or transfer of U.S. currency in an amount greater than $10,000, the institution shall file a Currency Transaction Report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution.  CTRs are filed with the Financial Crimes Enforcement Network ("FinCEN") on forms that require disclosure of, among other information, the identity of the individual who conducted the transaction, the individual or organization for whom the transaction was completed, and the amount of the transaction.  These regulations also require that multiple transactions be treated as a single transaction, that is, aggregated, if the financial institution has knowledge that they are conducted by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any single business day.

17.  CTRs are often used by law enforcement to uncover a wide variety of illegal activities including narcotics trafficking, money laundering, and tax evasion.  Many individuals involved in

7

illegal activities, such as narcotics trafficking, tax evasion, and money laundering are aware of such currency reporting requirements and take active steps to cause financial institutions to fail to file CTRs in order to avoid detection of the movement of large amounts of cash. These active steps are often referred to as "structuring" and involve making multiple cash deposits or withdrawals in amounts less than $10,000 on the same day or consecutive days in order to avoid the filing of CTRs.

18. Structuring is prohibited by 31 U.S.C. § 5324(a). Pursuant to 31 U.S.C. § 5324(a), it is a crime for an individual to, "for the purpose of evading the reporting requirements of [31 U.S.C. §] 5313(a)": (1) "cause or attempt to cause a domestic financial institution to fail to file a report required under [31 U.S.C. §] 5313(a)"; (2) "cause or attempt to cause a domestic financial institution to file a report required under [31 U.S.C. §] 5313(a) . . . that contains a material omission or misstatement of fact;" or (3) "structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."

19. Additionally, pursuant to 31 U.S.C. § 5331 and related regulations, any non-financial trade or business, who, in the course of such trade or business, receives more than $10,000 in coin or currency in one or more related transactions, is required

8

to collect personal identifying information from the customer and information about the transaction, and must file that information on a form filed with FinCEN. This trade or business currency transaction form is commonly referred to as a "Form 8300." Businesses that structure funds into their bank accounts or receive structured funds into their bank accounts will frequently fail to file Form 8300s in an attempt to further hide their significant cash activity.

20. Pursuant to Title 31, United States Code, Section 5324(b), it is a crime for an individual to "cause or attempt to cause a nonfinancial trade or business to fail to file a [form 8300] required under section 5331 . . . ."

21. As stated above, 31 U.S.C. § 5317(c) provides for the forfeiture of any property involved in a violation of 31 U.S.C. § 5324, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy.

### The Defendant Property and Subject Account

22. This complaint for forfeiture stems from a DEA investigation into money brokers operating in the Northern New Jersey area. As part of this investigation, on April 3, 2012, DEA seized approximately eight kilograms of heroin from a co-conspirator involved in a BMPE money laundering scheme. This co-conspirator has laundered or attempted to launder approximately $480,000 in multiple

financial transactions.

23. During the course of the investigation, DEA became aware of a Mexican money broker who used U.S. based business to conduct trade-based money laundering transactions. In the fall of 2012, DEA agents, acting in an undercover capacity, took possession of drug proceeds on behalf of the Mexican money broker. These brokers instructed the undercover DEA agents to structure these drug proceeds into several bank accounts, including JPMorgan Chase & Co. Account Number 000000999753338 held in the name of Elegant Footwear, Inc. (the "Subject Account")

24. The Subject Account is held in the name of Elegant Footwear, Inc. According to public records, Elegant Footwear, Inc. is a wholesaler of women's shoes based in City of Industry, California, with an additional showroom location in New York, New York.

25. The beneficial owner of the Subject Account is Cathy Din.

26. Cathy Din is the owner of Elegant Footwear, Inc.

27. Bank records for the Subject Account reveals cash deposits indicative of structuring and BMPE money laundering. Between January 10, 2012 and April 10, 2013, these structured cash deposits total at least $377,327.70. While no single cash deposit exceeded $10,000, there were numerous instances in which deposits

made on the same day, or within one or two business days, aggregated to amounts that totaled or exceeded $10,000 in cash. The following is a list of the structured activity involving the Subject Account during this time period, which occurred on or about the following dates:

| Date | Amount | Location |
|---|---|---|
| 01/10/2012 | $5,148.78 | Hacienda Heights, CA |
| 01/17/2012 | $5,105.70 | Hacienda Heights, CA |
| 01/18/2012 | $4,000.90 | Hacienda Heights, CA |
| 01/19/2012 | $2,606.10 | Hacienda Heights, CA |
| 02/14/2012 | $4,550.90 | Hacienda Heights, CA |
| 02/21/2012 | $3,735.30 | Hacienda Heights, CA |
| 04/17/2012 | $9,500.00 | Miami, FL |
| 04/17/2012 | $2,000.00 | Sacramento, CA |
| 04/30/2012 | $1,500.00 | Sacramento, CA |
| 04/30/2012 | $2,000.00 | Calexico, CA |
| 04/30/2012 | $6,544.80 | Hacienda Heights, CA |
| 05/03/2012 | $1,000.00 | Calexico, CA |
| 05/03/2012 | $6,576.80 | Hacienda Heights, CA |
| 05/10/2012 | $9,500.00 | El Paso, TX |
| 05/11/2012 | $1,700.00 | Calexico, CA |
| 05/14/2012 | $2,000.00 | Calexico, CA |
| 05/17/2012 | $2,137.50 | Imperial Beach, CA |
| 05/23/2012 | $9,000.00 | Miami, FL |
| 05/29/2012 | $1,386.00 | Imperial Beach, CA |
| 05/31/2012 | $2,000.00 | Miami, FL |
| 06/06/2012 | $3,171.00 | McAllen, TX |
| 06/11/2012 | $3,000.00 | Calexico, CA |

| | | |
|---|---|---|
| 06/12/2012 | $3,000.00 | McAllen, TX |
| 06/13/2012 | $3,900.00 | El Paso, TX |
| 06/21/2012 | $1,500.00 | Calexico, CA |
| 06/25/2012 | $1,128.30 | New York, NY |
| 06/25/2012 | $1,800.00 | Sacramento, CA |
| 06/29/2012 | $2,853.30 | McAllen, TX |
| 07/02/2012 | $1,500.00 | Calexico, CA |
| 07/03/2012 | $2,170.00 | McAllen, TX |
| 07/03/2012 | $8,000.00 | Elk Grove, CA |
| 07/05/2012 | $8,000.00 | Lodi, CA |
| 07/09/2012 | $3,800.00 | Lodi, CA |
| 07/12/2012 | $2,743.50 | McAllen, TX |
| 07/18/2012 | $7,276.00 | New York, NY |
| 07/19/2012 | $1,180.20 | McAllen, TX |
| 07/23/2012 | $1,300.00 | Calexico, CA |
| 07/23/2012 | $6,000.00 | El Paso, TX |
| 07/23/2012 | $7,027.20 | Hacienda Heights, CA |
| 07/25/2012 | $4,488.50 | Hacienda Heights, CA |
| 07/31/2012 | $5,343.40 | Hacienda Heights, CA |
| 08/01/2012 | $1,847.00 | New York, NY |
| 08/01/2012 | $8,169.00 | Hacienda Heights, CA |
| 08/16/2012 | $2,082.00 | McAllen, TX |
| 08/23/2012 | $2,481.60 | McAllen, TX |
| 08/24/2012 | $1,248.70 | Laredo, TX |
| 08/27/2012 | $1,800.00 | Sacramento, CA |
| 08/28/2012 | $6,355.40 | Hacienda Heights, CA |
| 08/30/2012 | $8,000.00 | Elk Grove, CA |
| 09/06/2012 | $1,249.20 | Hacienda Heights, CA |
| 10/04/2012 | $3,912.00 | Hacienda Heights, CA |
| 10/05/2012 | $2,268.00 | New York, NY |
| 10/09/2012 | $8,479.60 | Hacienda Heights, CA |
| 10/11/2012 | $6,270.00 | Hacienda Heights, CA |
| 10/19/2012 | $1,512.00 | Imperial Beach, CA |

| | | |
|---|---|---|
| 10/24/2012 | $9,400.00 | San Ysidro, CA |
| 10/25/2012 | $2,000.00 | Miami, FL |
| 10/25/2012 | $2,234.40 | Edinburg, TX |
| 10/25/2012 | $5,000.00 | El Paso, TX |
| 10/30/2012 | $1,069.20 | McAllen, TX |
| 10/31/2012 | $1,876.50 | Laredo, TX |
| 10/31/2012 | $2,790.00 | El Paso, TX |
| 11/05/2012 | $5,000.00 | Houston, TX |
| 11/07/2012 | $1,544.30 | New York, NY |
| 11/07/2012 | $8,362.00 | El Paso, TX |
| 11/08/2012 | $1,071.00 | Imperial Beach, CA |
| 11/13/2012 | $1,000.00 | Sacramento, CA |
| 11/20/2012 | $7,285.00 | El Paso, TX |
| 11/21/2012 | $1,000.00 | New York, NY |
| 11/23/2012 | $3,720.00 | El Paso, TX |
| 11/26/2012 | $5,000.00 | Atlanta, GA |
| 11/28/2012 | $3,375.60 | Los Angeles, CA |
| 12/11/2012 | $2,451.00 | Laredo, TX |
| 12/14/2012 | $1,980.00 | Calexico, CA |
| 12/17/2012 | $3,108.00 | El Paso, TX |
| 12/20/2012 | $4,500.00 | Chamblee, GA |
| 12/21/2012 | $3,410.00 | Calexico, CA |
| 12/21/2012 | $9,000.00 | Elk Grove, CA |
| 01/07/2013 | $2,000.00 | Calexico, CA |
| 01/08/2013 | $5,500.00 | Norcross, GA |
| 01/22/2013 | $2,588.00 | El Paso, TX |
| 01/23/2013 | $4,500.00 | San Diego, CA |
| 01/25/2013 | $4,410.00 | San Diego, CA |
| 02/19/2013 | $1,872.00 | Laredo, TX |
| 02/19/2013 | $3,760.90 | El Paso, TX |
| 02/22/2013 | $1,755.00 | Laredo, TX |
| 03/04/2013 | $1,000.00 | Calexico, CA |
| 03/05/2013 | $4,000.00 | El Paso, TX |

| | | |
|---|---|---|
| 03/14/2013 | $3,000.00 | El Paso, TX |
| 03/14/2013 | $7,497.12 | Hacienda Heights, CA |
| 03/18/2013 | $9,000.00 | Lodi, CA |
| 03/19/2013 | $1,130.40 | Laredo, TX |
| 03/19/2013 | $2,572.20 | Laredo, TX |
| 03/19/2013 | $6,716.40 | El Paso, TX |
| 04/03/2013 | $4,000.00 | El Paso, TX |
| 04/08/2013 | $7,000.00 | El Paso, TX |
| 04/10/2013 | $2,000.00 | Miami, FL |
| **TOTAL:** | $377,327.70 | |

28. This structuring and money laundering activity occurred at JPMorgan Chase Bank branches located in California, New York, Florida, Georgia, and Texas, however, there is no indication that Elegant Footwear, Inc. maintains a place of business or has agents outside of City of Industry, California and New York, New York.

29. Many of the cash deposits took place at locations in close proximity to the United States border with Mexico.

30. As discussed above, pursuant to 31 U.S.C. § 5331 and related regulations, any trade or business that receives more than $10,000 in one or more related transactions, is required to file a Form 8300 with FinCEN. However, despite the extensive cash deposit activity described above, Elegant Footwear, Inc. has never filed any Form 8300s with FinCEN.

31. On eight occasions on which aggregate cash deposits exceeded $10,000 in one business day, JPMorgan Chase Bank

14

automatically filed CTRs through an automated banking system within Chase Bank, but because these CTRs were not manually filed by a bank employee, they contained no identifying information about the individual(s) depositing of the cash.

32. Bank deposit slips for the Subject Account show multiple instances of different handwriting, indicating that multiple individuals structured deposits into the Subject Account at multiple locations throughout the United States.

33. Numerous major banks have closed Elegant Footwear's bank accounts due to Elegant Footwear's banking activity.

34. Cathy Din has informed bank employees at JPMorgan Chase that Din goes from bank to bank to open accounts because banks keep closing her bank accounts.

**CLAIMS FOR FORFEITURE**

35. Incorporated herein are the allegations contained in paragraphs one through thirty-four of the verified complaint.

36. Title 18, United States Code, Section 981(a)(1)(A), subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 . . . of this title, or any property traceable to such property."

37. Title 18, United States Code, Section 1956, provides, in pertinent part, that

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (B) knowing that the transaction is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii) to avoid a transaction reporting requirement under State or Federal law . . . .

38. A "financial transaction" as defined by 18 U.S.C. 1956(c)(4), includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or . . . . (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

39. Title 18, United States Code, Section 1956(c)(7)(A), provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under [the Bank Secrecy Act]." Section 1961(1) list as an offense "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substances Act),

16

punishable under any law of the United States." Section 1961(1) also lists as an offense violations of 18 U.S.C. § 1956, relating to the laundering of monetary instruments.

40. Title 31, United States Code, Section 5317(c) subjects to seizure and forfeiture "[a]ny property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy[.]"

41. Title 31, United States Code, Section 5313 mandates reports by domestic financial institutions on coins and currency transactions in excess of $10,000, as required by 31 C.F.R. § 1010.311.

42. Title 31, United States Code, Section 5324(a) provides:

> (a) No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508—
>
> ***
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.
>
> (b) No person shall, for the purpose of evading the report requirements of section 5331 or any regulation

17

prescribed under such section--

> (1) cause or attempt to cause a nonfinancial trade or business to fail to file a report required under section 5331 or any regulation prescribed under such section.

43. Title 31, United States Code, Section 5331 mandates reports by a trade or business for domestic coins and currency transactions in excess of $10,000.

44. Because the Defendant Property is involved in transactions structured to evade reporting requirements and the failure to file required reports, such funds are subject to forfeiture pursuant to 31 U.S.C. § 5317(c), as property involved in a violation of Sections 5313, 5324, and 5331 of Title 31, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy.

45. By reason of the above, the Defendant Property is subject to forfeiture to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(A) and 31 U.S.C. § 5317(c), as property involved in violation of 18 U.S.C. § 1956 and 31 U.S.C. § 5324.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Property and that all persons having an interest in the Defendant Property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant

Property to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated:    November 7, 2013
          New York, New York

                      PREET BHARARA
                      United States Attorney for
                      Plaintiff United States of America

By: _____
                      SHARON COHEN LEVIN
                      Assistant United States Attorney
                      ANAND SITHIAN
                      Special Assistant United States Attorney
                      One St. Andrew's Plaza
                      New York, New York 10007
                      (212) 637-1060/1085

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

DEREK SMITH being duly sworn, deposes and says that he is a Task Force Officer with the Drug Enforcement Administration ("DEA") and that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information and belief.

The sources for deponent's information and the ground of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
DEREK SMITH
Task Force Officer
Drug Enforcement Administration

Sworn to before me
This 7th day of November 2013.

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2014

20